**James MESSINA, Plaintiff,**

v.

**Police Officers Frederick T. MAZZEO, John McCowan, Elander Williams, Marc Alvarez, Scott Harris, Lance Ho, and John Keegan, individually and in their official capacities as police officers for the City of New York, Correction Officer Harold Watson, individually and in his official capacity as a correction officer for the City of New York, Ernel Lewis, M.D., individually and in his official capacity as a doctor for the City of New York, City of New York, Defendants.**

No. 93–CV–2931.

United States District Court,
E.D. New York.

May 24, 1994.

---

Joseph F. Tringali, Eric S. Kobrick, Aaron K. Kann, Simpson Thacher & Bartlett, New York City, for plaintiff.

Katherine Winningham, Asst. Corp. Counsel, Law Dept., New York City, for defendants.

*MEMORANDUM AND ORDER*

GLASSER, District Judge:

This is a motion to dismiss plaintiff's civil rights complaint and pendent state law claims stemming from the treatment he received during his arrest and pretrial detention. In the alternative, defendants move for partial summary judgment.[1] For the following reasons, defendants' motion is granted in part and denied in part.

*FACTS*

Although several facts are conceded, many are in dispute. To the extent that defendants have moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), plaintiff's allegations will be accepted as true. For the two claims upon which defendants seek summary judgment pursuant to Federal

Rule of Civil Procedure 56, *see* note 1 *supra,* the court has looked to matters outside of the pleadings including plaintiff's medical records, the affidavit of the prison physician, and the affidavit of plaintiff's attorney which asserts that further discovery is needed.

A. *The Arrest*

On April 2, 1992, at approximately 4:00 p.m., plaintiff James Messina ("Messina") was in the vicinity of Allen, Broome and Orchard Streets in New York City, when he was arrested by several New York City police officers. There is a dispute as to how the arrest transpired and the amount of force which was used in executing the arrest. Defendants contend that the police officers pursued Messina and apprehended him and that "reasonable force was applied in order to apprehend and handcuff plaintiff." Defs.' 3(g) Statement, ¶ 2. Plaintiff alleges that, in order to avoid a confrontation with the officers in front of his wife and two-year old son, he started running away after he saw the officers running toward him, stopped, and was then arrested. Third Amended Complaint ("Complaint"), ¶¶ 17, 18; Pl.'s 3(g) Statement, ¶ 2. The complaint further alleges that the officers threw Messina to the ground; that one of the officers stood on his back with one foot while ignoring his contention that he could not breathe; that the officers handcuffed plaintiff with excessive tightness; and that while in the police car "[w]ithout any provocation by plaintiff, who was still tightly handcuffed, defendant Police Officer slapped plaintiff several times in the face with his hand, and hit plaintiff several times in his abdomen and on his legs with a night stick, causing plaintiff severe pain." Complaint, ¶ 21.[2] Messina also alleges that

---

1. The claims upon which defendants seek summary judgment are plaintiff's Fourth Amendment claim against the individual police officers alleging excessive force, and plaintiff's Fourteenth Amendment claim against the prison's physician alleging an unconstitutional deprivation of medical care.

2. Neither Messina nor any of the police officers involved in the arrest submitted affidavits in connection with this motion. The record is therefore not clear as to what specifically prompted the officers to begin the pursuit and arrest of

plaintiff. However, Exhibit I to the Declaration of Katherine Winningham, February 4, 1994 ("Winningham Decl."), is an undated document signed by Officer Mazzeo which states that on April 2, 1992, he recovered one glassine envelope containing heroin stamped "Juice" from the ground where he observed Messina drop it. Messina has not alleged that he was arrested without probable cause. He pleaded guilty to criminal possession of a controlled substance in the seventh degree and was ordered to perform

he was "slapped and punched" when he arrived at the station house, and that the individual police officers "beat him with their night sticks, without provocation, and despite the fact that plaintiff was still handcuffed." Complaint, ¶ 22. Messina was also told by one of the police officers while at the station house that "You'll never forget this day," at which point he allegedly received a further round of slaps across the face, again allegedly without any provocation. Complaint, ¶ 23. Plaintiff also alleges that one of the police officers hit him in the back of the knees with a night stick, Complaint, ¶ 23, and that during his strip search he was slapped again, Complaint, ¶ 24. In the Complaint Messina states that no one attempted to intercede on his behalf during these beatings. Complaint, ¶ 24 ("... despite a realistic opportunity to do so, none of the Police Officers interceded to prevent this abuse.").

Defendants contend that it is undisputed that Messina received no serious injuries from these alleged beatings. Defendants base this contention on the fact that plaintiff allegedly did not allege that he received any particular injuries, Defs.' 3(g) Statement, ¶ 7 ("Plaintiff does not allege that he suffered any particular physical injury as a result of any use of force which occurred during the course of his arrest on April 2, 1993 [sic].")", and on the medical records and photographs of plaintiff taken at the time of his arrest, e.g., Defs.' 3(g) Statement, ¶ 4 ("The log book of the Fifth Precinct from April 2, 1992 reflect that, upon plaintiff's arrival at the precinct, he was in good condition."). In Paragraph 25 of the Complaint, however, plaintiff states that "[a]s a result of the excessive force used by defendant Police Officers and the failure to intercede to stop the use of such force despite realistic opportunities to do so, plaintiff sustained physical injuries to his right wrist, abdomen, face and legs, causing him to suffer intense pain, and emotional pain and suffering." *See also* Pl.'s 3(g) Statement, ¶¶ 6, 7 (plaintiff sustained injuries to his right wrist, abdomen, face and legs).

Two days following his arrest, on April 4, 1992, plaintiff was charged with criminal possession of a controlled substance and criminal possession of a hypodermic instrument in violation of New York Penal Law §§ 220.03 and 220.45 (McKinney 1989). On the day that he was charged, plaintiff was transferred to the custody of the New York City Department of Correction (the "DOC") and transported to "C95" at Rikers Island. Complaint, ¶ 27.

### B. *The Confrontation with Officer Watson*

For the purposes of defendants' motion to dismiss, the following facts are accepted as true. At approximately 11:15 a.m. on April 4, 1992, Messina arrived at Rikers Island and was interviewed by defendant Correction Officer Harold Watson ("Watson" or "Correction Officer Watson"). Complaint, ¶ 28. Watson asked plaintiff a number of questions for the purpose of completing a New York City Department of Correction Manual Admission and Classification Form (the "Form"). Watson asked Messina, "What is your religion?" After Messina informed Watson that he was Jewish, Watson replied, "While you're here, you'll be Catholic." Plaintiff again stated that he was Jewish, to which Watson replied: "Shut up. I'll tell you what your religion is. I don't want to hear another word from you." Complaint, ¶ 29. Watson then wrote "R/C" on the Form for prisoner's religion. Affidavit of Eric S. Kobrick, March 18, 1994 ("Kobrick Aff'd"), Ex. B.

Messina then received an orange identification card signifying that he is a Christian, instead of a blue identification card given to Jewish inmates. Complaint, ¶ 29. A blue identification card entitles Jewish inmates to certain privileges including kosher food and the right to attend religious services. Complaint, ¶ 29. Plaintiff alleges, and defendants do not contest for purposes of this motion, that he is a "sincere follower of and believer in the Jewish faith." Complaint, 30. Significantly, plaintiff does not allege that he specifically requested kosher food and was then denied the same; that he requested the right to attend religious services and was refused; or that he requested the right to dress in a

two days of community service. Pl.'s 3(g) Statement, ¶ 11.

certain manner or grow a beard but was told that he could not. Rather, plaintiff alleges that "[a]s a result of defendant Correction Officer Watson's actions, plaintiff was, with religious animus, denied access to kosher food and was otherwise subjected to abuse, insult and emotional distress." Complaint, ¶ 31.

## C. *The Access to Medical Care*

Plaintiff alleges that when he arrived at Rikers Island on April 4, 1992, he was a recovering heroin addict and a participant in a methadone maintenance treatment program at the Lower East Side Service Center, Inc. (the "Center"). Complaint, ¶ 32. Plaintiff further alleges that he received a Methadone Maintenance Treatment Program Identification Card from the Center which was taken from him at the time of his arrest. "At the Fifth Precinct, plaintiff asked defendant Police Officers to make sure that the Methadone ID card was returned to him, but it never was." Complaint, ¶ 33. When Watson prepared the Form discussed *supra*, he noted that Messina was a drug abuser and that the drug in question was "meth." Kobrick Aff'd, Ex. B.

It is undisputed that Messina was examined by the medical staff at Rikers Island upon his arrival, that his medical history was taken, and that he was seen by defendant Dr. Ernel Lewis ("Lewis"), who is employed by the Montefore Hospital which provides medical services at Rikers Island pursuant to a contract with the DOC. Affidavit of Ernel Lewis, M.D., March 29, 1994 ("Lewis Aff'd"), ¶ 1. Plaintiff alleges that at the time of his examination he was suffering from "acute withdrawal caused by the failure to receive

methadone treatment." Complaint, ¶ 37. Plaintiff states that when he met with Lewis he informed the doctor that he was suffering from withdrawal and needed to receive methadone. Complaint, ¶ 38. According to the complaint, Lewis replied by saying, "That's what they all say. I don't care what you do. You can stand on your head, tear the place apart, you're not getting methadone." Complaint, ¶ 39. It is undisputed that Messina did not receive methadone at this time. Rather, three days later, on April 7, 1992, after the medical staff at Rikers Island received confirmation from the Center that Messina was in a 21–day methadone program, plaintiff was prescribed methadone for a 21–day period. Defs.' 3(g) Statement, ¶ 24.[3]

The reason why Messina was not given methadone upon his arrival at Rikers Island is a matter of dispute. Plaintiff contends that it was a result of Lewis's "deliberate indifference to the serious medical needs of plaintiff." Complaint, ¶ 45.[4] Lewis, on the other hand, contends that the determination not to immediately administer methadone was based on his examination of Messina and the tests performed at the time:

Plaintiff was not suffering from acute symptoms of withdrawal at the time that he was examined on April 4, 1992. As shown by plaintiff's medical records on April 4, 1992, his blood pressure was normal, he was not dehydrated, his temperature was normal, he was not salivating or sweating excessively and his pupils were not dilated. He complained of diarrhea. Further, a test of plaintiff's urine revealed no sugar or ketones in plaintiff's urine, which would have been present had plain-

3. It is not clear from the record if Messina actually received any methadone from defendants. In their 3(g) Statement, defendants state that after confirmation from the Center, Messina was prescribed methadone for a 21–day period. Defs.' 3(g) Statement, ¶ 24. However, according to the Complaint, Messina was released immediately after his court date on April 7, 1992 and "[a]t no point during his detention at C95 at Rikers Island from April 4, 1992 to April 7, 1992 did plaintiff receive his required medication of methadone, causing him unnecessary pain, suffering and mental anguish." Complaint, ¶ 44. Lewis states in his affidavit that, "[p]laintiff's participation in a methadone maintenance pro-

gram was able to be verified on April 7, 1992. At that time, plaintiff was prescribed methadone, as his medical records demonstrate." Lewis Aff'd, ¶ 9 (citation omitted).

4. Messina also alleges that Lewis acted in a gross and wanton manner, and failed to exercise reasonable care in ascertaining whether plaintiff was suffering from acute withdrawal, whether plaintiff was part of a methadone treatment program, and whether plaintiff required methadone treatment or any other medical assistance. Complaint, ¶ 46.

tiff been severely dehydrated due to acute withdrawal. These physical findings are inconsistent with a diagnosis of acute withdrawal from heroin or methadone. Had plaintiff been suffering from acute withdrawal symptoms, he would have evidenced at least some of the following symptoms: an elevated pulse rate and blood pressure, hyperglycemia (high blood sugar), severe dehydration, an elevated temperature, dilated pupils, excessive sweating, yawning, running of the nose and tearing of the eyes, shortness of breath, goose flesh, nausea and vomiting, bone pain, insomnia, and liver tenderness.

Lewis Aff'd, ¶ 6 (citations omitted). Significantly, the determination to withhold methadone immediately upon Messina's arrival was not based on a written policy of the DOC which has been made part of the record. Rather, as the above-referenced excerpt establishes, the decision was based upon the medical opinion of Lewis.

Plaintiff further alleges that Lewis did not perform an adequate examination. Complaint, ¶ 40. Plaintiff alleges that he informed Lewis that he might kill himself because he was not sure if he could handle his agitated condition and suffering. "Rather than examine plaintiff or inquire further as to his medical needs, defendant Doctor Lewis simply sent plaintiff and his file to the mental health services unit because of plaintiff's threat to kill himself." Complaint, ¶ 40. In the medical documents completed upon Messina's arrival, it was noted that Messina was complaining that he was suffering from withdrawal and that he was "complaining of pain all over body." Winningham Decl., Ex. J at 9, 2. The documents also indicate, among other things, that Messina informed the medical staff that he uses heroin and methadone habitually; that plaintiff had been addicted to heroin for twenty-five years; and that his last dose of methadone had been on April 2, 1992. In summarizing the medical reports, Lewis states that "[p]laintiff's test results, physical examination and intake interview revealed no abnormalities in his physical condition, and no recent trauma of any type." Lewis Aff'd, ¶ 5.

Plaintiff also alleges that the day following his examination, on April 5, 1992, he was continuing to suffer from "serious withdrawal symptoms, including vomiting and chest pains." Complaint, ¶ 41. When he attended the medical clinic that day for those prisoners who were receiving methadone treatment, he again asked for the drug but was told that he could not receive any since he was not on "the list." Complaint, ¶ 42. The complaint alleges that plaintiff's condition worsened over the two day period he was at Rikers Island. "His complexion turned ghostlike, and his chest pains became more severe." Complaint, ¶ 43. In the complaint, Messina alleges that while on his way to court on April 7, 1992, he almost fainted and as a result the Center was contacted to confirm if Messina was in fact in its methadone treatment program. Complaint, ¶ 43.

\* \* \* \* \* \*

Based on the above events, plaintiff filed a complaint on July 1, 1993, pursuant to 42 U.S.C. § 1983 against defendants Officer Frederick Mazzeo ("Mazzeo") and four "John Doe" police officers in both their individual and official capacities for violation of Messina's Fourth Amendment rights; against Correction Officer Watson in his individual and official capacity for violation of Messina's First Amendment rights; and against "Doctor John Doe # 5" in his individual and official capacity for failure to exercise the degree of care of a reasonably prudent doctor in similar circumstances. Winningham Decl., Ex. A. After stipulating to an extension of time for Mazzeo to respond to the complaint, Messina filed an Amended Complaint on October 7, 1993. Plaintiff added the City of New York as a defendant and asserted a cause of action against it for liability based on the common law doctrine of respondeat superior. Winningham Decl., Ex. C, ¶¶ 69–74. Plaintiff made reference to a notice of claim which was served on the City of New York on June 3, 1992. The notice of claim is attached to the Winningham Declaration as Exhibit N. It asserts that Messina was arrested and held with excessive force; arrested without probable cause; denied access to kosher food; and was wrongfully denied medication. In this second complaint, plaintiff alleged that "Doctor John Doe # 5,"

while acting under color of state law, was "deliberately indifferent to plaintiff's serious medical needs...." Winningham Decl., Ex. C, ¶ 58. Messina also added pendent state law claims against the individual defendants for negligence and negligent infliction of emotional distress, and added a Fourteenth Amendment equal protection claim against Correction Officer Watson.

On October 22, 1993, a status conference was held before Magistrate Judge A. Simon Chrein of the Eastern District of New York. Winningham Decl., ¶ 6. Magistrate Chrein ordered defendants to answer plaintiff's interrogatories which sought to identify the police officers, correction officers and medical personnel identified in the first two complaints as possible defendants. Winningham Decl., Ex. E. Magistrate Chrein wrote: "[Except for answering the interrogatories,] discovery is stayed pending resolution of a motion to dismiss which may be filed." Winningham Decl., Ex. E. Plaintiff was given leave to file an amended complaint no later than two weeks after the receipt of the identification interrogatories. Defendants were granted leave to move to dismiss or answer within 45 days after service of the amended complaint. Winningham Decl., Ex. E.

After receiving the City of New York's and Mazzeo's interrogatory responses on or about November 8, 1993, plaintiff served and filed his Second Amended Complaint on November 22, 1993, naming as individual defendants the persons listed in defendants' interrogatory responses. These individuals are: Mazzeo, John McGowan, Elander Williams, Marc Alvarez, Scott Harris, Lance Ho and John Keegan (the "defendant Police Officers"). These names were supplied in response to the interrogatory which sought the names of defendants John Does ## 1–4. Defendants had stated in their responses that these officers were on a tour of duty with defendant Mazzeo on April 2, 1992. The responses also stated that Correction Officer Watson was one "Thomas Watson" and that Dr. John Doe # 5 was Dr. Ernel Lewis.

Defendants thereafter stipulated to the service of a Third Amended Complaint in order to correctly identify Correction Officer Watson as Harold Watson. This complaint—the one presently before the court—was filed on January 7, 1994. In the Complaint, plaintiff alleges seven claims for relief. In the second paragraph of the Complaint, defendants Mazzeo, et al., are defined collectively as "defendant Police Officers" employed by the New York City Police Department. The Complaint then alleges as follows:

a. *The First Claim for Relief.* In the first claim for relief, plaintiff alleges a violation of 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution by defendant Police Officers who, acting under color of state law, allegedly "subjected plaintiff to unwarranted, unreasonable and excessive force and failed to intercede to prevent the use of such force despite realistic opportunities to do so...." Complaint, ¶ 48. The first claim for relief also asserts pendent state law claims for the emotional and physical pain and suffering allegedly caused by the defendant Police Officers.

b. *The Second Claim for Relief.* The second claim for relief alleges a violation of 42 U.S.C. § 1983 and the First Amendment to the United States Constitution by defendant Watson who, acting under color of state law, allegedly "denied plaintiff the free exercise of his religion, without any legitimate penological objective or compelling state interest...." Complaint, ¶ 51. The second claim for relief also alleges a pendent state law claim for emotional pain and suffering.

c. *The Third Claim for Relief.* The third claim for relief alleges a violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution by defendant Watson who, acting under color of state law, allegedly "denied plaintiff the equal protection of the law by intentionally and purposefully discriminating against plaintiff on the basis of his religion, without any compelling governmental interest...." Complaint, ¶ 54. The third claim for relief also alleges a pendent state law claim for emotional pain and suffering.

d. *The Fourth Claim for Relief.* The fourth claim for relief alleges a violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution by

defendant Lewis who, acting under color of state law, was allegedly "deliberately indifferent to plaintiff's serious medical needs...." Complaint, ¶ 57. The fourth claim for relief also alleges a pendent state law claim for emotional and physical pain and suffering.

e. *The Fifth Claim for Relief.* The fifth claim for relief is a pendent state law claim against all individual defendants for negligence. Specifically, this claim for relief alleges that the individual defendants owed plaintiff a duty of care while he was in their custody, and that by breaching that duty they caused plaintiff emotional and physical pain and suffering. Complaint, ¶¶ 60–62.

f. *The Sixth Claim for Relief.* The sixth claim for relief is a pendent state law claim against all individual defendants for the negligent infliction of emotion distress. This claim for relief alleges a negligent breach of the duty allegedly owed to plaintiff while he was in defendants' custody. Complaint, ¶¶ 64–66.

g. *The Seventh Claim for Relief.* The seventh claim for relief is a pendent state law claim against the City of New York based on the doctrine of respondeat superior. Specifically, the Complaint alleges that the defendant Police Officers, Watson, and Lewis, while in the employ of the City of New York, and while acting within the scope of their employment, caused plaintiff emotional and physical pain and suffering by their negligence and negligent infliction of emotional distress. Complaint, ¶ 69.

Defendants now move to dismiss, or move for partial summary judgment, based on the following: (i) because the complaint fails to allege personal involvement by any of the individual police officers, the Section 1983 causes of action against them should be dismissed; (ii) the first claim for relief should be dismissed pursuant to Rule 12(b)(6) because it fails to adequately allege a violation of the Fourth Amendment; in the alternative, summary judgment should be granted defendants because there is no genuine dispute as to the reasonableness of the force used in arresting Messina; (iii) the second claim for relief should be dismissed because, even if accepted as true, defendant Watson's

remarks and actions do not violate Messina's First Amendment right to exercise his religion; and the third claim for relief should be dismissed because the complaint does not allege that a group or class of individuals are being treated unfairly for purposes of the Equal Protection Clause of the Fourteenth Amendment; (iv) the fourth claim for relief should be dismissed pursuant to Rule 12(b)(6) because the complaint fails to allege a deprivation of plaintiff's constitutional rights vis-a-vis the medical attention he received at Rikers Island; in the alternative, defendants seek summary judgement on the ground that no reasonable jury could conclude that Lewis was indifferent to Messina's medical needs; (v) the federal claims against the individual defendants should be dismissed because the defendant Police Officers, Watson, and Lewis are protected by the doctrine of qualified immunity; and (vi) the pendent state law claims against the individual defendants should be dismissed for failure to properly notify their municipal employer pursuant to New York's Civil Practice Law and Rules, and the pendent state law claim against the City of New York should be dismissed for failure to sue that entity within the applicable statute of limitations period.

## DISCUSSION

I. *Section 1983 and Allegations of Personal Involvement*

■ Defendants contend that plaintiff has failed to allege how any of the defendant Police Officers (Mazzeo, McGowan, Williams, Alvarez, Harris, Ho, or Keegan) were personally involved in the alleged violations of Messina's Fourth Amendment rights, and therefore conclude that all Section 1983 causes of action must be dismissed as against them. As noted above, these individual defendants are defined in the Complaint collectively as "defendant Police Officers." The Complaint then goes on to state that the "defendant Police Officers" used excessive force in arresting Messina without describing what role each individual defendant played in the alleged constitutional violations.

In *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883 (2d Cir.1987), a tow car company and its

owner brought a Section 1983 action against the City of New York for, among other things, its alleged failure to afford them a prompt hearing to review the denial of their applications for tow car medallions. The plaintiff also named as defendants Benjamin Ward, Police Commissioner of the City of New York, and Anthony Savarese, a sergeant in the New York City Police Department. The Second Circuit held that "appellants' claims against the individual defendants herein cannot stand." *Id.* at 886. The court explained:

> Although the caption of appellants' complaint names as defendants Benjamin Ward, Police Commissioner of the City of New York, and Anthony Savarese, a sergeant in the New York City Police Department, *the complaint is entirely devoid of any allegations of their personal involvement in denying appellants either a prompt hearing or the additional medallions sought. Having failed to allege, as they must, that these defendants were directly and personally responsible for the purported unlawful conduct, their complaint is "fatally defective" on its face. Black v. United States*, 534 F.2d 524, 527–28 (2d Cir.1976); *accord Owens v. Coughlin*, 561 F.Supp. 426, 428 (S.D.N.Y.1983).

*Id.* (emphasis added). *Accord Morabito v. Blum*, 528 F.Supp. 252, 262 (S.D.N.Y.1981) ("The courts have consistently held that, where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted.").

Applying this well-settled maxim to the Complaint, it cannot be said that the Complaint "contains no allegations indicating how the defendant[s] violated the law or injured the plaintiff." The complaint specifically alleges that all of these individual police officers participated in using excessive force when they arrested Messina, handcuffed him, placed him in the police car, and searched him while at the police station. Federal Rule of Civil Procedure 8(a)(2) provides in part that a pleading must contain "a short and plain statement of the claim showing that the

pleader is entitled to relief...." The Complaint fulfills this mandate. The Federal Rules, as illustrated by Rule 8(a), do not require that plaintiff set out a defendant's precise role in the injurious conduct. It is, however, constitutionally imperative that defendants are put on notice as to the nature of the allegations against them. Plaintiff has done that by alleging that *all* individual defendants participated in the use of excessive force. It would be asking too much for an arrestee to remember and plead the role each of several police officers played in an alleged instance of police brutality.

In this regard, the authorities cited by defendants are inapposite because in those actions the individual defendants were *not* put on notice as to their role in or their relationship to the actions at issue in the case. For example, in *Rodriguez v. Chandler*, 641 F.Supp. 1292 (S.D.N.Y.1986), *aff'd*, 841 F.2d 1117 (2d Cir.1988), a college professor brought an employment discrimination action against his former employer alleging that the college paid him a lower salary than that paid to less senior professors, denied him tenure, and terminated his employment because of his race, his national origin, and his activities as an advocate for faculty and student minority interests at the college. Plaintiff also named as a defendant the chancellor of the college, but the court dismissed the complaint as to him: "Wharton is mentioned in the complaint only in paragraph six, which alleges that none of the complaint's substantive charges are directed against him and that he is meant only to be included in the prayer for relief. Absent any substantive allegations against Wharton, all claims against him must be dismissed." *Id.* at 1294 n. 1. In other authorities cited by defendants, the plaintiff had failed to establish that an individual defendant was personally involved and hence summary judgment was appropriate. *E.g.*, *Williams v. Smith*, 781 F.2d 319 (2d Cir.1986) (where prison guard had only filed a report and was not personally involved in a hearing which plaintiff alleged had violated his due process rights, summary judgment was appropriate because plaintiff had failed to raise an issue of materi-

al fact regarding the personal involvement of the guard).[5]

More relevant to the action before the court is *Brown v. Coughlin,* 758 F.Supp. 876 (S.D.N.Y.1991). In *Brown,* a state prisoner brought a Section 1983 action alleging deliberate indifference to his medical needs against various state and municipal individual defendants (commissioner, doctors, superintendent). The state defendants maintained that the complaint contained no allegations that the commissioner and/or the superintendent participated in any of the alleged deprivations of plaintiff's medical care and hence the federal claims should be dismissed as to them. The court, however, held that the pleadings were sufficient to withstand summary dismissal on the pleadings because "enough information can be gleaned from the facts as pleaded to show that Coughlin and Dalsheim could be charged with knowledge of the unconstitutional conditions pervading at Downstate in accordance with a low standard of health care delivery at the facility." *Id.* at 889. So too in this action: enough information can be gleaned from the facts as pleaded to show that Mazzeo, McGowan, Williams, Alvarez, Harris, Ho and Keegan participated in the use of excessive force in arresting and restraining Messina on April 2, 1992. This is because the Complaint alleges that they all participated in a group arrest of Messina in which excessive force was allegedly used.

Also instructive is *Brook v. Thornburgh,* 497 F.Supp. 560 (E.D.Pa.1980). In *Brook,* the plaintiff brought an action against certain state officials pursuant to Sections 1983 and 1985 alleging that his discharge as an attorney examiner at the state's department of revenue was solely based on his political sponsorship by and affiliation with the Democratic party, in violation of the First and Fourteenth Amendments. There, the defendants also contended that the complaint should be dismissed because it did not allege with sufficient specificity the personal involvement of each defendant in the allegedly unconstitutional acts. Like the complaint at issue in this action, the complaint in *Brook* alleged that all individual defendants participated in the unconstitutional actions at issue in the case (*i.e.,* the effort to drive Democratically affiliated and sponsored employees from their state jobs), and then later specified the tactics used by the defendants (*e.g.,* elimination of office space and telephone service). The court refused to dismiss the complaint for failure to adequately plead personal involvement by the defendants:

> While the complaint does not specify which defendant took which specific action, it does put all the defendants on notice as to those actions in which they are all accused of participation.... The complaint does not simply set forth conclusory allegations that plaintiff was denied first amendment rights without stating how he was so deprived.... In this case, personal involvement on the part of all defendants has been alleged.... Under the federal notice pleading, this complaint is sufficient. Defendants will have ample opportunity to develop by deposition or interrogatories, or both, whatever fuller exposition of plaintiff's claim they require for their defense.

*Id.* at 562 (citations omitted).

In their Reply Memorandum, however, defendants argue that *Brook* is inapplicable because there the defendants were alleged to have participated in every specific act of wrongful termination alleged by the plaintiff which, defendants contend, is not the case here. Defs.' Reply Mem. at 10. The defendants' reading of *Brook,* however, would require an arrestee to detail who delivered which specific blow in order to survive a Rule 12(b)(6) motion. The Federal Rules of Civil Procedure, as noted above, do not require such exactitude notwithstanding the Second Circuit's constant admonition that the personal involvement of a defendant is a strict prerequisite to the imposition of monetary liability for violations of 42 U.S.C. § 1983. *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883 (2d Cir.1987); *Williams v. Smith,* 781 F.2d 319 (2d Cir.1986); *Black v. United States,*

5. In this case, the defendant Police Officers have yet to be deposed and hence it would be premature to seek summary judgment based on their lack of personal involvement in the alleged constitutional violations. In any event, defendants are not seeking summary judgment on this prong of their motion.

534 F.2d 524 (2d Cir.1976). Rather, in *Brook,* the complaint alleged that all individual defendants participated in the unconstitutional efforts and later delineated the means used. Here as well, Paragraphs 2 and 17–26 of the Complaint put all individual defendants on notice as to the nature of the allegations brought against them (use of excessive force in executing an arrest) and hence a Rule 12(b)(6) dismissal would be inappropriate.

As of this writing there are also disputed issues of fact regarding the personal involvement of these individual defendants. Neither Messina nor the defendant Police Officers submitted affidavits in connection with this motion and no depositions have yet been taken. Discovery, however, should uncover the exact role each police officer played or did not play in the arrest, and the court can entertain, at the proper time and if the discovery so warrants, a motion for summary judgment on the issue of personal involvement. However, based on the pleadings, the motion to dismiss the Section 1983 causes of action against the individual defendants, for failure to adequately allege personal involvement, is denied.

## II. *The Excessive Force Claim*

As noted above, defendants have moved pursuant to Rule 12(b)(6) for an order dismissing plaintiff's first cause of action against the defendant Police Officers for a violation of Messina's Fourth Amendment rights. In the alternative, defendants' seek partial summary judgment on this cause of action.

### A. *Motion to Dismiss Standard*

■ When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must take all allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Ortiz v. Cornetta,* 867 F.2d 146, 149 (2d Cir.

1989). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Easton v. Sundram,* 947 F.2d 1011, 1014–15 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). The court's consideration on a motion to dismiss is limited to the factual allegations in the complaint; documents incorporated by reference into the complaint; matters of which judicial notice may be taken; and documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

■ Therefore, in order to dismiss Messina's first claim for relief, it must be beyond doubt that plaintiff can prove no set of facts in support of his claim for a violation of the Fourth Amendment to the United States Constitution.[6] In *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court of the United States overruled prior Second Circuit precedent that allowed a jury to consider subjective factors such as "malice" and "good faith" in determining whether the force used by persons acting under color of state law was excessive. Because of *Connor,* "the jury need only consider whether the officers acted reasonably in light of the facts and circumstances of the situation they faced, without regard to their underlying motives or subjective intent toward the suspect." *Anderson v. Branen,* 17 F.3d 552, 559 (2d Cir.1994). Because the test is now one of objective reasonableness—without any reference to the officers' subjective state of mind—a motion to dismiss an excessive force claim is appropriate if, accepting all of the allegations as true, it is clear that the force used by the officers

---

**6.** The Fourth Amendment provides in relevant part that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. This amendment protects persons from the use of excessive force by state police officers incident to an arrest. *Tennessee v. Garner,* 471 U.S. 1, 105

S.Ct. 1694, 85 L.Ed.2d 1 (1985) (state officials' use of deadly force against fleeing felons violated the Fourth Amendment ban on unreasonable seizures); *Heath v. Henning,* 854 F.2d 6, 8 (2d Cir.1988) (claims of excessive force in making arrests are based solely on the Fourth Amendment).

was objectively reasonable under the circumstances. *See, e.g., Roundtree v. City of New York,* 778 F.Supp. 614 (E.D.N.Y.1991). In this case, defendants contend that accepting all of plaintiff's allegations as true, defendants used objectively reasonable force and therefore the complaint must be dismissed; in other words, that the amount of force used was not excessive as a matter of law.

Defendants' contention, however, does not withstand scrutiny: accepting Messina's allegations as true, which a court must on a motion to dismiss, then it is a fact that the defendant Police Officers, among other things, slapped Messina *without any provocation while he was in the police car and handcuffed* and that he suffered injuries to his right wrist, abdomen, face and legs, because of those and other blows. It may reasonably be held that the unprovoked slapping of a handcuffed prisoner while under custody in a police car is an example of an amount of force which is excessive as a matter of law. An examination of cases where courts have dismissed an excessive force claim on a motion to dismiss quickly uncovers the infirmity of defendants' contention.

In *Bates v. Westervelt,* 502 F.Supp. 94 (S.D.N.Y.1980), relied upon by defendants, the plaintiff alleged that his arresting officer entered the inmate holding area and struck one of his fellow inmates in the face. The plaintiff then alleged that he yelled for help and was himself hit in the ribs by the defendant. *Id.* at 95. The court granted defendant's Rule 12(c) motion for judgment on the pleadings and his Rule 12(b) motion to dismiss because "[a]s to plaintiff's claim against defendant Officer Westervelt, it cannot be construed to rise to the level of a constitutional violation." *Id.* at 96. The court explained:

> Not every tort creates a § 1983 claim for remedy. While an assault by a law enforcement officer upon an inmate may be a serious deprivation of that inmate's rights,

it is necessary to determine if there was a need for the use of force, the amount of force used, and the extent of injury. *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Plaintiff has offered no evidence as to the extent or existence of any injury he received from Officer Westervelt. Neither side has alleged any circumstances which would have required the use of force against plaintiff. However, applying the standard of *Johnson,* it does not appear that Officer Westervelt's conduct "crossed the constitutional line" so as to have deprived plaintiff of his constitutional rights. *Fowler v. Vincent,* 452 F.Supp. 449 (S.D.N.Y.1978).

*Id.* The analysis and holding of *Bates* highlights that a motion to dismiss an excessive force claim is only appropriate when it is clear that the violence at issue is an isolated incident which, when taking into account all of the circumstances, establishes that excessive force was not used. Such is not the case in this action because the Complaint alleges many unnecessary slaps and blows during arrest, the ride to the police station, and during the search at the police station.[7]

The complaint in *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), however, presents a situation more akin to the facts alleged in this action. In *Johnson,* the plaintiff alleged, *inter alia,* that a guard reprimanded him, struck him twice in the head, threatened him, and detained him for two hours. The Second Circuit reversed the district court which had dismissed the complaint pursuant to Rule 12(b)(6). Although the court's reference to the guards' subjective state of mind is no longer good law in light of *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), *see supra,* the Court's determination that plaintiff's complaint survived summary dismissal based

---

7. In *Reilly v. Doyle,* 483 F.2d 123, 129 (2d Cir. 1973), also relief upon by defendants, the court dismissed plaintiff's Section 1983 and 1985 action because, "[t]he complaint here fails to allege any use of excessive police force or that the procedures followed in arresting and detaining her went so far beyond what would normally be required in detaining a person overnight as to constitute a cause of action under § 1983." The differences between the complaint as described in *Doyle* and the instant case are clear; whereas the allegations in *Doyle* were conclusory, Messina has alleged numerous blows, slaps, and assaults.

on the pleadings is significant. The court wrote that,

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. Taking this view, and reading the complaint with the generosity required in *pro se* civil rights actions ... we think it stated a claim against Officer Fuller.

*Johnson*, 481 F.2d at 1033 (citation omitted).

In *Johnson*, the plaintiff alleged an isolated incident of violence by a prison guard and his Section 1983 action was not dismissed. In fact, the dissent in *Johnson* noted that in cases prior to the court's decision, "the actions of the prison officials evidenced a continuing *pattern* of misconduct, which assumed constitutional proportion; here, the action of Officer Fuller falls short of the conduct proscribed in *Inmates* and *Martinez*, *supra*, in terms of both duration and type of punishment inflicted. As the majority note [sic], the complaint here 'alleged a single, spontaneous incident, unforeseen and unforeseeable by higher authority.'" *Id.* at 1035 (Moore, J., dissenting). In this case, Messina has alleged even more than one isolated incident of excessive force by a person acting under color of state law: he alleges unprovoked violence at the scene of the arrest, in the police car, and at the police station. Therefore, even under Judge Moore's dissent (which was rejected by the Second Circuit), plaintiff has pleaded a Section 1983 cause of action for excessive force.

■ Defendants argue, however, that because plaintiff has not claimed any serious injury resulting from the alleged use of excessive force, his complaint must be dismissed as a matter of law. *See* Defs.' Mem. at 15 ("plaintiff cannot claim that he suffered any actual physical injury as a result of this 'unreasonable force;' rather, he merely claims that he suffered 'emotional and physical pain and suffering....'"). In *Robison v. Via*, 821 F.2d 913 (2d Cir.1987), however, the court took a different view of the amount of injury needed to sustain an excessive force claim. In *Via*, the court affirmed the denial of summary judgment on an excessive force claim brought pursuant to 42 U.S.C. § 1983 against a state trooper. The plaintiff had alleged that the trooper had "pushed" her against the inside of the door of her car, "yanked" her out, "threw [her] up against the fender," and "twisted [her] arm behind her back." *Id.* at 923–24. The plaintiff testified that she suffered bruises lasting a "couple of weeks." The court held that assertions such as these are sufficient to prevent the summary dismissal of a Section 1983 claim for excessive force. In so holding the court wrote,

> While Robison did not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure is not fatal to her claim. If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe. *See Norris v. District of Columbia*, 737 F.2d 1148, 1150–52 (D.C.Cir.1984); *Bowman v. Casler*, 622 F.Supp. 836, 838 (N.D.N.Y.1985); *see also Bellows v. Dainack*, [555 F.2d 1105 (2nd Cir.1977) ] in which the description of the events did not suggest that plaintiff had been seriously or permanently injured.

*Id.* at 924. *See also Johnson v. Doherty*, 713 F.Supp. 69, 71 (S.D.N.Y.1989) (summary judgment for police officers is denied because fact issue existed as to whether excessive force was used by officers notwithstanding that plaintiff's injuries appeared to be minor; "The fact that an injury is neither permanent nor severe or that the victim required no medical treatment is not fatal to a § 1983 claim."). A lack of an allegation of serious physical injury stemming from Messina's arrest and search does not, therefore, require a Rule 12(b)(6) dismissal. In the Eighth Amendment context, the Court has also de-

termined that the use of excessive force against a prisoner may constitute cruel and unusual punishment even when the inmate does not suffer serious injury. *Hudson v. McMillan,* —— U.S. ——, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (reversing Fifth Circuit's holding that inmates alleging use of excessive force in violation of the Eighth Amendment must prove "significant injury").

Defendant also brings to the court's attention a number of cases where isolated, minor altercations between persons acting under color of state law and plaintiffs did not rise above the level of common law battery and hence the court found no constitutional violation in the defendant's actions. *E.g., Roundtree v. City of New York,* 778 F.Supp. 614, 622 (E.D.N.Y.1991) (where plaintiff alleged that he was pushed into a police car this court dismissed the complaint because "to conclude that a 'push' that does not cause the slightest of physical injuries to the plaintiff is nonetheless an actionable use of excessive force would be to hold that *any* physical contact by an arresting officer with the arrested person is actionable.") (emphasis in original); *Santiago v. Yarde,* 487 F.Supp. 52, 54 (S.D.N.Y.1980) (where plaintiff does not allege that he was struck or kicked by prison guard or sought medical treatment, summary judgment for defendant on Section 1983 cause of action is appropriate because "[a]n allegation of unspecified bruises on the arms and legs does not 'shock the conscience' in the context of this case, where plaintiff does not controvert the defendant's claim that he and the other correction officers were engaged in a good faith effort to maintain order and discipline during an institutional search procedure."). However, the differences between Messina's complaint and the allegations in *Roundtree* and *Santiago* are manifest: Messina alleges repeated slaps and blows at the scene of the arrest, in the police car, and at the station house. Furthermore, unlike the plaintiffs in *Roundtree* and *Santiago,* Messina alleges that "[a]s a result of the excessive force used by defendant Police Officers ... plaintiff sustained physical injuries to his right wrist, abdomen, face and legs, causing him to suffer intense pain, and emotional pain and suffering." Complaint, ¶ 25.

Defendants also argue that a 12(b)(6) dismissal is appropriate because the context of this case establishes that, as a matter of law, the force used by the defendant Police Officers was not excessive. Defs.' Mem. at 15 ("Moreover, plaintiff's own allegations demonstrate the necessity of force in effecting his arrest. Plaintiff affirmatively admits in his complaint that he fled from police officers ... who witnessed him in the purchase of drugs.... Under these circumstances, officers were clearly justified in using force to effect his arrest.") (citations omitted). Defendants' argument, however, ignores the allegations, which must be accepted as true on a motion to dismiss, that Messina was beaten while he was handcuffed and under the custody of the defendant Police Officers both in the police car and at the police station. Although defendants contend that the police records attached to their moving papers also establish that excessive force was not used (*e.g.,* the police log which reveals that Messina was in good condition when he arrived), these same records reveal that Messina was not charged with escape, resisting arrest or assault and that he, in fact, did not attempt to escape, commit suicide or assault on officer. Given his allegations of unprovoked violence, the silence in the defendants' records regarding escape and the like further indicates that a Rule 12(b)(6) motion would be premature.

Defendants also argue that a Rule 12(b)(6) order is required because taken separately Messina's allegations of tight handcuffs and objectionable statements by the defendant Police Officers do not state a Section 1983 claim for violation of the Fourth Amendment. Defs.' Mem. at 15 (citing *Brumfield v. Jones,* 849 F.2d 152, 156 (5th Cir.1988) (handcuffs which cause discomfort does not constitute excessive force) and *Marquez–DeJesus v. Asuega,* No. 86 Civ. 9210, 1989 WL 252647 at *3 (S.D.N.Y. Jan. 9, 1989) ("it is well established that the mere use of words without physical injury does not violate the Constitution.")). The point to be made here, of course, is that Messina is *not* alleging a constitutional violation based on the use of handcuffs or words alone; rather, his Complaint alleges a pattern of abuse from the moment of arrest to his strip search at the

police station. Finally, defendants argue that "[w]ith respect to plaintiff's claims of subsequent use of force, plaintiff does not state a claim that rises to the level of a § 1983 violation." Defs.' Mem. at 15 (citing *Roundtree*). As demonstrated above, however, Messina's complaint is very different from the complaint contained in *Roundtree;* here, Messina alleges, among other things, a particularly harsh and unprovoked attack while in custody (*e.g.,* Complaint, ¶ 23 (Messina is hit in the back of the knees with a nightstick)).

In sum, the allegations of excessive force in plaintiff's complaint are neither conclusory nor bare. They set forth a set of facts which, if proven, would permit a jury to find that defendants used excessive force in arresting and searching plaintiff. A motion to dismiss the complaint pursuant to Rule 12(b)(6) would, therefore, be inappropriate. *Simpson v. Saroff,* 741 F.Supp. 1073, 1078 (S.D.N.Y. 1990) (in denying defendant's motion for summary judgment, court holds that allegations by plaintiff of "punched stomach, swollen and bleeding wrists from tight handcuffs, as well as a faintly detectable scar on her left wrist" states claim for use of excessive force under Section 1983).

### B. *Summary Judgment Standard*

As noted above, defendants have moved, in the alternative, for summary judgment dismissing plaintiff's first cause of action against the defendant Police Officers. It is therefore necessary to review the standards for granting summary judgment pursuant to Federal Rule of Civil Procedure 56.

Summary judgment "shall be rendered forthwith if ... there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In opposing a properly supported summary judgment motion, "an adverse party may not rest upon the mere allegations or denials of [its] pleading, but [its] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party

has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■■ In deciding a summary judgment motion the court need not resolve disputed issues of fact, but need only determine whether there is any genuine issue to be tried. *Eastman Mach. Co. v. United States,* 841 F.2d 469, 473 (2d Cir.1988). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The nonmoving party, therefore, must come forward with facts, and not doubts, as to the veracity of the moving party's allegations: "Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. One of the purpose's of summary judgment, therefore, "is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–24, 106 S.Ct. at 2553. "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir. 1989).

■ Defendants argue that summary judgment is appropriate on the first claim for relief because any claim that plaintiff suffered an injury of constitutional dimensions is "belied by contemporaneous records of plaintiff's condition." Defs.' Mem. at 16. *See also* Defs.' Reply Mem. at 14 ("defendants are entitled to summary judgment where plaintiff fails by even submitting his own affidavit to demonstrate a genuine issue of material fact by controverting materials offered by defendants which demonstrate that, in fact, no excessive force was used."). As noted above, the police log book, attached as Exhibit K to the Winningham Declaration,

states that at 1650 on April 2, 1992, "P.O. Mazzeo sh # 26731 present with [?] arrest ... # 2) *James Messina* M/W/38 DOB 6/12/52 address 128 Baruch Pl. N.Y., N.Y. for [criminal possession of a controlled substance,] cond-good[,] funds $127.00." Defendants also draw the court's attention to the photographs of Messina which are attached to his prison documents and which, defendants contend, indicate that plaintiff was not physically abused by the defendant Police Officers. Winningham Decl., Exs. L, M. Defendants also rely on the medical records submitted by defendants, and the affidavit of Lewis, which, defendants contend, reveal that Messina was not suffering from a serious physical injury when he arrived at Rikers Island on April 4, 1992. Lewis's April 4, 1992, physical examination sheet, for example, states that Messina was not suffering from any head or other trauma. Winningham Decl., Ex. J at 2. In his affidavit, Lewis also states that,

> Plaintiff's test results, physical examination and intake interview revealed no abnormalities in his physical condition, and no recent trauma of any type. His pulse, temperature and blood pressure were normal. Plaintiff complained of generalized pain over his body.

Lewis Aff'd, ¶ 5 (citations omitted). These observations were recorded two days following the arrest.

As pointed out above, however, the minimal extent of a plaintiff's injury is not a bar to a Section 1983 cause of action against a person acting under color of state law. *Robison v. Via*, 821 F.2d 913 (2d Cir.1987); *cf. Hudson v. McMillan*, — U.S. —, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). Therefore, even if accepted as accurate and unbiased, the records which indicate no serious injury could not alone support a motion for summary judgment on plaintiff's first claim for relief. Although Messina has not submitted an affidavit asserting that he was arrested with excessive force, neither have any of the individual Police Officers submitted affidavits detailing the facts of the arrest and search. Furthermore, as noted above, Magistrate Chrein stayed all discovery (other than interrogatory answers) pending the out-

come of what defendants had contended would be a motion to dismiss, not a motion for summary judgment. *See* Winningham Decl., Ex. E ("... discovery is stayed pending resolution of a motion to dismiss which may be filed."). The contemplated motion was, therefore, a motion aimed at the pleadings, not the facts, and hence plaintiff has not had an opportunity to depose the individual police officers, Lewis, or the individuals who also examined Messina upon his arrival at Rikers Island. Summary judgment would therefore be premature.

Moreover, irrespective of the stay in discovery, a review of the case law in this circuit reveals that, as a general rule, the issue of whether excessive force was used is for the jury to decide, even though the amount of force used and the extent of injury asserted may be minimal. For example, in *Calamia v. City of New York*, 879 F.2d 1025 (2d Cir.1989), the evidence presented at trial established that an arrestee had been shoved in the chest by a police officer, thrown to the floor, and tightly handcuffed for 5–6 hours. The jury found for plaintiff on the excessive force claim. Defendant moved for judgment notwithstanding the verdict ("n.o.v.") or a new trial based on the assertion that the evidence was insufficient to establish excessive force. The Second Circuit held that the defendant was entitled to a new trial on the claim of excessive force because of flawed jury instructions. The court also held, however, that the defendant was not entitled to judgment n.o.v.; the evidence was enough to send the issue of excessive force to the jury:

> Nonetheless, though the instructions on the excessive-force claim were flawed, the evidence of record sufficed to warrant submission of his claim to the jury and to warrant denial of Sutton's motion for judgment n.o.v. The record showed that as soon as Calamia answered Sutton's knock at his door, Sutton shoved him to the floor and immediately cuffed his hands behind his back. There was evidence that the handcuffs were unduly tight, and though Sutton argues to us that Calamia's discomfort was "momentary," Calamia testified that he was kept in this painful condition for five or six hours before being taken to the police station. *It was for the jury to*

*determine whether Sutton's conduct in connection with the arrest, pushing Calamia to the floor and causing him to remain there in a painful posture without circulation in his hands for many hours while officers collected the property was, as an objective matter, reasonable.* The denial of judgment n.o.v. on this claim was proper.

*Id.* at 1035 (emphasis added).

The holding and analysis in *Calamia* strongly suggests that the issue of excessive force is better left to the jury if the plaintiff is able to establish, at the very least, that force was used and some injury was sustained. Plaintiff should be allowed to develop such evidence through discovery (specifically the depositions of the individual police officers) before the case is summarily dismissed pursuant to Rule 56.

### III. *The Freedom of Religion Claim*

■ Defendants have moved for an order pursuant to Rule 12(b)(6) dismissing plaintiff's second and third claim for relief against Correction Officer Watson which alleges a deprivation of Messina's First and Fourteenth Amendment rights. As recounted above, the Complaint alleges that Watson refused to mark Messina as Jewish on his intake sheet and provided him with an orange identification card instead of a blue identification card which grants prisoners access to kosher food. Complaint, ¶ 29.

#### A. *The First Amendment*

The First Amendment to the Constitution of the United States provides in part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend

I. The First Amendment is applicable to state defendants through the Fourteenth Amendment. *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (reversing 12(b)(6) dismissal where complaint alleged that plaintiff was a Buddhist and was not permitted to use the state prison chapel although other prisoners, who were members of other religious sects, were permitted to use the chapel). By its very terms, the First Amendment circumscribes the right of a state actor to prohibit the *exercise* of one's religion. Therefore, it is not surprising that the courts, when applying this amendment in the context of a state or federal prison, apply a balancing test between the rights of a prisoner to engage in activities associated with his or her system of beliefs, versus the needs of the prison officials to administer their facilities safely and efficiently.

For example, the seminal case on the First Amendment rights of prisoners in the Second Circuit is *Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975). In *Kahane,* the plaintiff sought "orders requiring the prison administrators to conform the conditions of his incarceration to his religious beliefs concerning diet and prayer." *Id.* at 493. The court held that the prison officials cannot unnecessarily deprive the prisoner of kosher food: "We agree with the court below that the prison authorities are proscribed by the constitutional status of religious freedom from managing the institution in a manner which unnecessarily prevents Kahane's observance of his dietary obligations." *Id.* at 495. The court reasoned that a denial of kosher food could not be justified by "any important or substantial government interest," *Id.* at 495 n. 6, and that providing kosher food did not represent an insurmountable burden.[8]

---

**8.** The standard for examining claims of substantial government infringement on religious practice has recently been codified in The Religious Freedom Restoration Act of 1993 (the "Act"), Pub.L. No. 103–141, 107 Stat. 1488, now found in 42 U.S.C. §§ 2000bb, *et seq.* Congress has determined that the government (state or federal) may "substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a *compelling* governmental interest; and (2) is the least restrictive means of furthering that *compelling* governmental interest." 42 U.S.C.

§ 2000bb–1(b) (emphasis added). By mandating that the government establish a "compelling governmental interest," Congress has effectively overruled the holdings of prior Supreme Court decisions which required that the government establish that the practice or prohibition was reasonably related to "legitimate" penological interests. *See, e.g., Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987). The statute states that one of the purposes of the Act is to "restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)

Given the First Amendment's protection of one's right to exercise his or her religious beliefs and the demands of administering a penal institution, the cases are legion with examples of religious practices which either do or do not impermissibly impact on a legitimate penological objective or compelling state interest. The focus, however, is always on the tangible and physical expression of one's religious beliefs. *See, e.g., Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.) (striking down prison regulation which required Rastafarians to submit to a haircut upon admission to the state prison but upholding regulations which prohibited weekly religious congregations where outside clergy are not present; the test is "whether the particular regulation affecting some constitutional right asserted by a prisoner is 'reasonably related to legitimate penological interests.'") (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990).[9] *See also Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.) (summary judgment for defendants denied where defendants prevented plaintiff from attending services while confined in "limited privilege program"; "the district court should not have dismissed appellant's first amendment claim without requiring prison officials to establish the basis for the first amendment restrictions imposed."), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989).

The extent to which the First Amendment protects the tangible and concrete exercise of one's religious beliefs is also illustrated in *Ross v. Coughlin,* 669 F.Supp. 1235 (S.D.N.Y. 1987). Upon his arrival at the prison, the plaintiff in *Ross,* an orthodox Jew, was told that he must surrender his skull cap, *tephilin* and *tzitzit,* even though he explained their religious significance and requested their return.[10] During his nine-week stay at the institution only his skull cap was returned; his beard was shaved irrespective of his protestations; he was not allowed kosher food; and he was told to keep his beard trimmed. Defendant's motion to dismiss plaintiff's Section 1983 claim based on violations of the First and Fourteenth Amendments was denied in part and granted in part because, using the balancing approach articulated in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), the court found that some regulations served legitimate penological needs (*e.g.,* the shaving of inmates upon their arrival), while others did not (*e.g.,* the regulation requiring that plaintiff's beard be trimmed).[11] Defendant's motion to dismiss the plaintiff's cause of action vis-a-vis his deprivation of kosher food was also denied:

> According to the pleadings, Ross did not receive a nutritionally adequate diet for ten weeks of his incarceration. Plaintiff received no kosher meals at Downstate which allegedly resulted in significant weight loss. Upon arriving at Green Haven he was not put on the kosher food program for one week. These allegations are sufficient to state a claim against the State.

---

and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened...." 42 U.S.C. § 2000bb(b)(1). The Act is applicable to prisoners. 42 U.S.C. §§ 2000bb–1(a), § 2000bb–2(1); *Allah v. Menei,* 844 F.Supp. 1056 (E.D.Pa. 1994) (applying the Act to action by Islamic sect seeking recognition in state penal institution).

This change in the standard to be applied—a compelling versus a legitimate interest—does not affect the analysis upon which this court must determine defendants' motion. (Indeed, neither party brought the Act to the court's attention.) No matter what standard the government must meet in order to justify regulations which substantially burden a person's exercise of religion, the balancing test is not even applicable until and unless a person's right to exercise his or her religion has been implicated. As the foregoing discussion indicates, Messina's Complaint does not allege a violation of his right to exercise his religion.

9. As noted above in footnote 8, *supra,* the standard adopted in *Turner* is no longer applicable where the government seeks to substantially burden a person's exercise of religion. 42 U.S.C. § 2000bb–1(b).

10. The plaintiff was told to "get that shit off your head" (referring to plaintiff's skull cap) and "[y]ou cannot have this shit here. Either send it home, or we'll destroy it." (referring to plaintiff's *tephilin* and *tzitzit* ). *Id.* at 1237.

11. *But see* footnote 8, *supra.*

The State argues that the prison authorities at Downstate met the standards required in *Kahane* by offering Ross the entire range of food served to the general population, which includes kosher food. Yet the items mentioned, eggs, peanut butter, cheese and milk, were allegedly not prepared according to the laws of Kashrut and therefore fail to meet the minimum standards required in *Kahane*. Further, it appears prison officials made it clear, with offensive slurs, that the prison would not accommodate Ross' needs as a Jewish inmate.

*Ross,* 669 F.Supp. at 1242.

Unlike the pleadings before the court, the pleadings in *Ross* made it clear that the plaintiff requested kosher food and the request was denied. *Id.* at 1238 ("When Ross explained that he only ate kosher food, he was allegedly told, 'Where the fuck do you think you are, a Holiday Inn[?] You eat what's here or starve, cause you're in my home now, and I don't cater to no Jew bastards.' "). Therefore, because it was alleged that the food that was offered did not meet constitutional standards vis-a-vis the plaintiff's right to receive kosher food, defendant's motion to dismiss was denied. In this case, the Complaint does not allege that Messina requested kosher food and that the request was denied.[12] Rather, it alleges that he received an orange identification card instead of a blue identification card which grants prisoners "access" to kosher food.

■ Messina argues that dismissal is inappropriate because the Complaint alleges that Correction Officer Watson deprived Messina of his status as a Jew and hence his actions violate the very heart of the First Amendment. "Here, much more than plaintiff's right to participate in practices that are

an integral part of the Jewish faith is at issue.... Defendant Watson deprived plaintiff *of his identity as a Jew.*" Pl.'s Mem. at 26–27 (emphasis in original). However, as the discussion above demonstrates, the First Amendment does not, in the context of prison confinement, protect a prisoner's status or identity, without more, as a member of a particular sect. Rather, it protects the free exercise of one's religion. The cases which protect the use of an inmate's religious name are not to the contrary. *E.g., Salaam v. Lockhart,* 905 F.2d 1168 (8th Cir.1990) (refusal by prison authorities to add plaintiff's religious name to prison records is a violation of plaintiff's First Amendment rights where the effort on the part of defendants to do so would not be onerous), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 677, 112 L.Ed.2d 669 (1991); *Felix v. Rolan,* 833 F.2d 517, 518 (5th Cir. 1987) ("The adoption of Muslim names by inmates practicing that religion is generally recognized to be an exercise of both first amendment speech and religious freedom."). In these cases the courts recognize that the adoption of a religious name is an essential attribute of the plaintiff's religion and that the institution's refusal, in certain circumstances, to recognize the use of that name violates constitutional principles. "[Salaam] understands his faith to require his name to take on one of the attributes of God, and he finds his former name offensive to his beliefs." *Salaam,* 905 F.2d at 1170. In this case, the Complaint does not allege a deprivation of an attribute of Messina's religion, following a request of the authorities, such as the right to grow one's beard, pray three times a day, or wear a skull cap.

Plaintiff also argues that if defendants' motion is granted it would give prison officials the right to designate the religion of

---

12. Plaintiff's counsel conceded at oral argument that Messina did not request kosher food or the right to attend services while he was incarcerated at Rikers Island. He argued, however, that because of the alleged beatings and the hostile response of Correction Officer Watson, it was reasonable for Messina to conclude that any request would be futile and, therefore, because Correction Officer Watson made it impossible for Messina to even attempt to exercise his religion while in prison, the complaint has stated a claim upon which relief can be granted. Nowhere in

the Complaint, however, is it alleged that but for the actions of the defendant Police Officers and Correction Officer Watson, Messina would have requested kosher food and the right to attend services. It is worth repeating that plaintiff has now filed four complaints in this action and has been represented by counsel on each occasion. It was only at oral argument that plaintiff asserted, for the first time, that Correction Officer Watson deprived Messina of the right to even ask for the opportunity to exercise his religion.

prisoners at their whim which would, in turn, "bar that prisoner from participating in practices that he had not [sic?] followed previously even [if] it were undisputed that the practices were an integral part of his religion." Pl.'s Mem. at 28. Plaintiff's dire predictions are ill-founded. Dismissal of the second claim for relief is not a green light for prison officials to cavalierly disregard the religious rights of a prison inmate, any more than the judicial determination that common law battery by a prison official is not a constitutional violation, *Bates v. Westervelt*, 502 F.Supp. 94 (S.D.N.Y.1980), is an invitation for prison guards or police officers to batter those under their custody. It is simply a recognition that a complaint which does not allege the deprivation of a constitutionally protected religious *practice* cannot withstand a Rule 12(b)(6) motion. To the extent that prison officials will, in fact, bar prisoners from participating in religious activities, the First and Fourteenth Amendments of the United States Constitution, and the provisions of The Religious Freedom Restoration Act of 1993, more than amply retain their power to protect these inmates.

▇▇▇ In sum, in order to state a claim upon which relief can be granted for a violation of a prisoner's First Amendment right to the free exercise of religion, the plaintiff must allege that he requested the right to practice his religion and was denied that right; that is, that he or she requested certain foods, diets, access to books, or religious services and was denied the same. In this case, the complaint makes no such affirmative allegation but states, instead, that "[a]s a result of the defendant Correction Officer Watson's actions, plaintiff was, with religious animus, denied access to kosher food and was otherwise subjected to abuse, insult and emotional distress." Complaint, ¶ 31. Although this paragraph of the Complaint makes reference to "access" to kosher food, there is no allegation that Messina was *deprived* of kosher food after stating to the prison officials that he required it. This is fatal to Messina's First Amendment claim. Accepting all the

allegations as true, the objectional language and behavior of Correction Officer Watson did not, according to the complaint, result in a deprivation of Messina's constitutional right to practice those aspects of his religion which do not impermissibly impinge upon any legitimate penological objective or compelling state interest and hence the second claim for relief is, therefore, dismissed pursuant to Rule 12(b)(6).[13]

## B. *The Fourteenth Amendment*

▇▇▇ The Fourteenth Amendment to the United States Constitution provides in relevant part that "nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In the context of prison regulations or the activity of prison guards which allegedly infringe an inmate's right to practice his or her religion, a complaint alleging a violation of the Equal Protection Clause requires an allegation that a particular group or class of individuals has been treated differently from others within the institution. *See Benjamin v. Coughlin*, 905 F.2d 571, 575 (2d Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990):

> In addition to their first amendment claims, plaintiffs here assert that they have been denied equal protection by reason of treatment different from that afforded to other religious groups. While the *Turner/Shabazz* standard was established in the context of first amendment issues, it is also relevant to the assessment of equal protection claims in the prison setting. As to such claims, the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests. *See Williams v. Lane*, 851 F.2d 867, 877 (7th Cir.1988), *cert. denied*, 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989). We must determine whether "the ... groups are so similar that discretion has been abused." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433

**13.** Because this is the fourth complaint filed in this action, the second claim for relief is dismissed with prejudice.

U.S. 119, 136, 97 S.Ct. 2532, 2543, 53 L.Ed.2d 629 (1977).[14]

■■■ In his third claim for relief, plaintiff does not allege that Jews at Rikers Island are denied the free exercise of their religion while other groups in the institution are not burdened with similar restrictions. Rather, the Complaint alleges that Correction Officer Watson "denied plaintiff the equal protection of the law by intentionally and purposefully discriminating against plaintiff on the basis of his religion, without any compelling governmental interest...." Complaint, ¶ 54.

On a motion to dismiss, all allegations must be accepted as true, all reasonable inferences drawn in favor of the nonmoving party, and it must be clear that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. In this case, even if accepted as true, plaintiff has not alleged that Jews either were or are being denied certain rights which are offered to others at Rikers Island. He simply alleges an isolated incident of bigotry without any reference to other groups in the institution. Therefore, his equal protection claim must fail as a matter of law.[15]

### IV. *The Medical Treatment Claim*

In plaintiff's fourth claim for relief he alleges that defendant Lewis was "deliberately indifferent to plaintiff's serious medical needs" (Complaint, ¶ 57), in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment. Defendants have moved for a Rule 12(b)(6) dismissal of this claim for relief, or, in the alternative, for summary judgment pursuant to Rule 56.

#### A. *Motion to Dismiss*

The Fourteenth Amendment to the United States Constitution provides in relevant part that "nor shall any State deprive any person of life, liberty, or property without due process of law[.]" U.S. Const. amend. XIV, § 1. At the time of the alleged deprivation of medical care, Messina had not yet been convicted but was, rather, a pretrial detainee. Any discussion of the due process rights of pretrial detainees must begin with the seminal case of *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1978).

In *Bell*, a class action was brought challenging numerous conditions of confinement and practices at the Metropolitan Correction Center ("MCC"), a federally-operated short-term custodial facility in New York City designed primarily to house pretrial detainees. The plaintiffs challenged, among other things, the practice of the MCC in replacing some single bunks with double bunks in order to cope with an increase in the prison population. In refusing to strike down the practice as unconstitutional, the Court noted that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee." *Id.* at 535, 99 S.Ct. at 1872. The Court held that the government may detain a person charged with a crime in order to ensure his presence at trial, and it may "subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536–37, 99 S.Ct. at 1873. In analyzing a policy or practice of the institution, the focus, therefore, is on whether the restrictions imposed by the government amount to punishment or whether they represent an acceptable regulatory restraint. *Id.* at 537, 99 S.Ct. at 1873 ("This Court has

---

**14.** *But see* footnote 8, *supra,* for a discussion of the new standard to be used for a claim of substantial government infringement on religious practice.

**15.** Plaintiff argues that he is "entitled to discovery to determine whether Jews as a group are being deprived of their identity and their right to participate in practices that are an integral part of their faith." Pl.'s Mem. at 29. Discovery in this regard would only be appropriate if plaintiff had properly alleged an equal protection claim and now sought to defeat a motion for summary judgment. In this case, however, plaintiff has already filed four complaints stemming from the same set of facts and not one has alleged that Jews were treated differently at Rikers Island from other religious groups. The basis for asserting a claim should be investigated before the filing of a complaint, not after. This claim for relief is therefore dismissed with prejudice.

recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may."). In determining whether a particular prohibition or policy is unconstitutionally punitive, the Court wrote that "[a]bsent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* at 538, 99 S.Ct. at 1873–74 (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963)). Absent an intent to punish, "the determination whether these restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose." *Bell,* 441 U.S. at 561, 99 S.Ct. at 1886.

Defendants contend that plaintiff's Complaint, in essence, attacks a policy or practice on the part of Lewis, and the penal institution which detained Messina, not to give inmates methadone immediately upon their arrival at Rikers Island. Therefore, the argument continues, the Complaint should be dismissed pursuant to Rule 12(b)(6) because such a policy is, as a matter of law, rationally related to the legitimate nonpunitive governmental purpose of securing a drug-free environment for inmates and protecting the security of other inmates and prison personnel. Defs.' Mem. at 24–26. In this regard, defendants rely in large measure on *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754 (3d Cir.1979). In *Pierce,* state pretrial detainees brought a class action seeking a declaratory judgment that the prison's drug detoxification program was unconstitutional;

the program provided that any inmate who had been receiving methadone treatment from an authorized treatment center in Allegheny County prior to his incarceration was allowed to receive such treatment for six days following the date of confinement, after which the treatment was terminated. After a full trial on the merits, the district court held that the drug detoxification program was not unconstitutional and the Court of Appeals affirmed. Using the analysis provided in *Bell,* the court held that "there is nothing in either the district court's opinion or the record of the testimony presented at trial which indicates a punitive purpose on the part of jail authorities." *Id.* at 761. The court also noted that a "legitimate security interest is also present in the jail's restriction of methadone treatment." *Id.*

If Messina were, in fact, attacking a policy or practice of Lewis and the Rikers Island Health Services which, like the policy in *Pierce,* sought to curtail the amount of methadone distributed to inmates, then it would follow that the fourth claim for relief might be subject to dismissal pursuant to Rule 12(b)(6) based on the fact that the Complaint does not allege an intent to punish Messina, and the fact that there are legitimate nonpunitive governmental interests in such a curtailment. Such, however, is not the complaint before the court. Rather, plaintiff has alleged a violation of the Fourteenth Amendment based on Lewis's alleged deliberate indifference to Messina's medical needs by not prescribing methadone which, plaintiff alleges, his condition upon arrival warranted.[16] Because plaintiff, a pretrial detainee, has alleged deprivation of medical care by a person acting under color of state law, the situation requires a different analysis.

In this regard, the Second Circuit in *Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 152, 116

---

16. The contention that plaintiff is not attacking a policy or practice akin to the policies analyzed in *Bell* and *Pierce,* is highlighted by the fact that Lewis himself states that the decision to withhold methadone was based on his medical determination, and was therefore not based on a policy of Rikers Island Health Services. Lewis Aff'd, ¶ 7 ("Based on my examination of plaintiff, my observations as to his medical condition, and my seventeen years' experience in the practice of medicine, it was my medical determination that plaintiff was not suffering from acute withdrawal symptoms and that prescribing methadone at that time was not medically appropriate. My diagnosis and determination regarding plaintiff's treatment was based solely on my professional opinion as a physician.") (citation omitted).

L.Ed.2d 117 (1991), has established some guidelines for a district court when responding to a pretrial detainee's allegations of deprivation of medical care. In *Bryant,* the plaintiff sought an abortion while incarcerated in a state facility. When it was not timely afforded her, and she was forced to carry the fetus to term, she brought a Section 1983 action for violation of her Fourteenth Amendment rights. The court noted that,

> Although a pretrial detainee's due process rights to adequate medical treatment are at least as great as the Eighth Amendment protections available to prison inmates, *see Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983), the Supreme Court has left unresolved what standard applies. It remains unsettled, in other words, whether a pretrial detainee must meet the "deliberate indifference" standard of *Estelle* or show "gross negligence" or "recklessness" or prove conduct not amounting to intentional acts, but that is more than simple negligence to state a claim of a constitutional deprivation under the Due Process Clause.

*Id.* at 983. In *Bryant,* the district court had granted defendants summary judgment based on its determination that plaintiff had failed to establish a genuine issue of fact as to whether defendants acted with deliberate indifference to her medical needs. The Court of Appeal affirmed and noted that it need not determine if the district court had used a correct standard (*i.e.,* deliberate indifference) because "appellant has failed, as a matter of law, to adduce sufficient evidence to permit a jury to find that the defendants' actions were more than merely negligent." *Id.* at 984. The court concluded that "[a]lthough the delay [in scheduling the abortion] remains unexplained, appellant has not adduced any proof that it was the result of anything more than simple negligence." *Id.*

Applying this reasoning to defendants' Rule 12(b)(6) motion to dismiss, the following can be concluded: In order to adequately plead a violation of a pretrial detainee's Fourteenth Amendment right to adequate medical care, the plaintiff must allege action by a person acting under color of state law which is, at the very least, more than mere negligence, and, at the very most, a deliberate indifference to plaintiff's medical needs. *Id.* at 984 ("Thus, whatever degree of negligence must be shown to state a valid due process claim for the state's failure to afford a pretrial detainee a requested abortion to which she is entitled under the law, as Bryant is here, it is plain that simple negligence is not enough."). In this case, Messina has alleged, and for the purposes of a motion to dismiss it must be accepted as true, that at the time he was seen by Lewis and the medical staff at Rikers Island he was "suffering from acute withdrawal caused by the failure to receive methadone treatment," Complaint, ¶ 38, and that when he requested methadone from Lewis, his reply was, "I don't care what you do. You can stand on your head, tear the place apart, you're not getting methadone," Complaint, ¶ 39. There is no dispute that plaintiff was entitled to adequate medical care upon his arrival at the prison. *See* N.Y.Correct.Law § 137(6)(c) (McKinney 1987).[17] And if, based on plaintiff's condition, it was a medical necessity that he receive methadone immediately, then plaintiff has alleged action by Lewis which is something more than negligent; in fact, plaintiff has alleged that Lewis was deliberately indifferent to Messina's medical needs.[18] This complaint, therefore, alleges facts which, if proved true, would demonstrate a violation of Messina's Fourteenth Amendment rights. A Rule 12(b)(6) dismissal is therefore inappropriate. *Compare Rodney v. Romano,* 814 F.Supp. 311 (E.D.N.Y. 1993) (petition for writ of habeas corpus denied where state pretrial detainee alleged

---

**17.** This statute provides in relevant part that,
> Where such confinement is for a period in excess of twenty-four hours, the superintendent shall arrange for the facility health services director ... to examine into the state of health of the inmate, and the superintendent shall give full consideration to any recommendation that may be made ... for measures with re-

spect to dietary needs or conditions of confinement of such inmate required to maintain the health of such inmate[.]
N.Y.Correct. Law § 137(6)(c) (McKinney 1987).

**18.** The court, of course, makes no determination on the merits of Messina's allegations.

deprivation of constitutional right to adequate medical care because court-ordered psychologist refused to prescribe hypnotherapy as requested by petitioner).

### B. *Summary Judgment*

■ As noted in some detail above, defendants have come forward with documentary and testimonial evidence which, they contend, establish beyond doubt that Messina received more than adequate medical care by Lewis. Lewis's affidavit, for example, recounts his examination of Messina, the tests administered, the questions asked, and he concludes that "[p]laintiff's medical treatment while at Rikers Island was at all times consistent with generally accepted standards of care, and was not motivated by any punitive intent." Lewis Aff'd, ¶ 10. The medical records attached as Exhibit J to the Winningham Declaration also state, among other things, that Messina's pulse, temperature, and blood pressure were normal which is inconsistent with acute withdrawal. Winningham Decl., Ex. J. at 4. Defendants argue that these submissions establish that no reasonable jury could conclude that Lewis was in any way indifferent to Messina's medical needs and hence summary judgment is appropriate.

As noted above, however, Magistrate Chrein stayed all discovery in this matter and hence plaintiff has not yet deposed Lewis or the other members of his staff regarding their treatment of Messina. In this regard Rule 56(f) of the Federal Rules of Civil Procedure provides in full that:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

"The party seeking a continuance under Rule 56(f) must submit an affidavit setting forth '(1) what facts are sought and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort [he] has made to obtain them, and (4) why [he] was unsuccessful in those efforts.'" *Ammcon, Inc. v. Kemp,* 826 F.Supp. 639, 646 (E.D.N.Y. 1993) (quoting *Hudson River Sloop Clearwater, Inc. v. Department of Navy,* 891 F.2d 414, 422 (2d Cir.1989)). In his affidavit in opposition to defendants' motion, plaintiff's attorney states that a deposition of Lewis and others, in exploring their treatment of Messina, may establish that there exists a disputed issue of fact regarding the adequacy of the medical care which he received. Kobrick Aff'd, ¶ 32. Plaintiff, therefore, has satisfied this four prong test: Because of Magistrate Chrein's stay, plaintiff has not deposed the individual police officers or Lewis, and depositions of these individuals may establish that there are disputed issues of fact vis-a-vis the amount of force used at the arrest and the adequacy of the medical care given by Lewis. If they do not, defendants may re-submit their motion for summary judgment on the first and fourth claims for relief.[19]

Defendants oppose plaintiff's Rule 56(f) request based on the fact that they have already produced Messina's medical records from Rikers Island. Defs.' Reply Mem. at 4 ("It is difficult to discern from plaintiff's papers precisely what additional discovery of materials in defendants' possession could be obtained which would enable plaintiff to respond to defendants' alternative request for summary judgment on plaintiff's claims against police officers or defendant Dr. Lewis."). However, it cannot be said with certainty that a *deposition* of Lewis will not uncover material issues of disputed facts vis-a-vis his decision not to administer methadone upon Messina's arrival. Defendants also contend that allowing further discovery would be inappropriate because facts regard-

---

**19.** Plaintiff also seeks time to retain a medical expert "to evaluate the medical care plaintiff received at Rikers Island and to opine on the nature of methadone withdrawal." Kobrick Aff'd, ¶ 32. In view of the fact that defendants announced their intention to move for dismissal pursuant to Rule 12(b)(6), and not for summary judgment, it is not unreasonable that plaintiff has not yet obtained expert medical reports refuting Lewis's conclusions.

ing Messina's physical or psychological injuries are within the domain of plaintiff and hence those facts could have been brought forward in opposition to defendants' motion for partial summary judgment. *United States v. Private Sanitation Indus. Ass'n*, 811 F.Supp. 808, 817–18 (E.D.N.Y.1992) ("There is no reason to grant a continuance to a litigant who has personal and intimate knowledge of the underlying facts for the purported purpose of conducting discovery to ascertain those identical facts."), *aff'd*, 995 F.2d 375 (2d Cir.1993). However, as noted previously, given defendants' intention to move for dismissal, it was not unreasonable that plaintiff had not retained his own expert vis-a-vis the adequacy of Lewis's medical care. Furthermore, because Lewis also has personal and intimate knowledge of the underlying facts, it would not be inappropriate to allow plaintiff to cross-examine him on the conclusions and observations contained in his affidavit. As a general rule, whenever discovery of key participants has not been taken, summary judgment is premature. *See, e.g., Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983) ("[C]aution should be exercised in granting summary judgment ... when the party opposing the motion has been denied relevant discovery.").

In sum, in order for plaintiff to prevail on his fourth claim for relief, he must demonstrate that the medical care provided by Lewis was more than mere negligence, but perhaps less than deliberate indifference. *Bryant v. Maffucci*, 923 F.2d 979 (2d Cir. 1991). In order to do this, plaintiff should be allowed the opportunity to depose the key players. Furthermore, the court in *Bryant* noted that a defendant's state of mind is an issue in a due process challenge to the medical care provided a pretrial detainee, *id.* at 985 ("[w]e recognize caution must be exercised in granting summary judgment where state of mind is at issue, as here...."), and therefore plaintiff should be allowed to question Lewis on this subject as well. If after discovery plaintiff is unable to establish that a disputed issue of fact exists regarding the medical care provided by Lewis, the court can entertain a motion for summary judgment. *Compare for e.g., Liscio v. Warren*, 901 F.2d 274 (2d Cir.1990) (failure to examine

pretrial detainee over a three day period while plaintiff was allegedly going through drug and alcohol withdrawal could be accepted by jury as deliberate indifference to plaintiff's medical needs and hence disputed issue of fact exists defeating motion for summary judgment), *with McCloud v. Delaney*, 677 F.Supp. 230 (S.D.N.Y.1988) (summary judgment for defendant granted where defendant prescribed penicillin against plaintiff's wishes and the evidence established great concern for plaintiff's well-being).

## V. *Qualified Immunity*

Defendants contend that all federal claims for relief should be dismissed as to the individual defendants based on the doctrine of qualified immunity. Defs.' Mem. at 33–34.

"The privilege of qualified immunity generally shields government officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not "violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." ' " *Gan v. City of New York*, 996 F.2d 522, 531 (2d Cir.1993) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In *Malley v. Briggs*, 475 U.S. 335, 338–40, 106 S.Ct. 1092, 1094–96, 89 L.Ed.2d 271 (1985), the Supreme Court stated that "[o]ur cases ... make plain that '[f]or executive officers in general' ... qualified immunity [for personal liability for money damages] represents the norm." This standard turns on the "objective legal reasonableness of the official's act," *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2739, and protects "all but the plainly incompetent or those who knowingly violate the law," *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096. The challenged conduct must be "assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738).

In determining whether a right was clearly established at the time the defendants acted, a court must consider:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith,* 21 F.3d 496, 500 (2d Cir. 1994), (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). "Assertion of the privilege should be upheld unless the 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Gan,* 996 F.2d at 532 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039). Qualified immunity grants an official an entitlement not to stand trial or face the other burdens of litigation so long as the official did not violate clearly established federal law. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985) ("The entitlement is an *immunity from suit* rather than a mere defense to liability; and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.") (emphasis in original). A finding of qualified immunity, therefore, can be appropriate in a motion to dismiss if the allegations so warrant. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Id.*

 In this case, Messina's allegations state claims of violations of clearly established law: the individual police officers are alleged to have violated Messina's Fourth Amendment right to be free from the use of excessive force; and Lewis is alleged to have violated Messina's Fourteenth Amendment right to adequate medical care.[20] It cannot seriously be contended that these rights were not clearly established at the time of their alleged violations, or that they are constitutional rights of which a reasonable person would not know. Dismissal based on quali-

fied immunity is therefore inappropriate. *Thompson v. City of Lawrence, Kan.,* Civ. A. No. 93–2253, 1994 WL 114172 (D.Kan. March 30, 1994) (where complaint alleges excessive force in course of plaintiff's arrest, defendant's motion to dismiss based on qualified immunity is denied because "these allegations, if true, would support a finding that defendant violated clearly established law entitling [plaintiffs] to relief under 42 U.S.C. § 1983 [and] [t]herefore, the merits of these claims are properly addressed through the summary judgment procedure."); *Ramirez v. Barrett,* No. 93–C–2706, 1994 WL 8254 (N.D.Ill. Jan. 7, 1994) (motion to dismiss Section 1983 excessive force claim based on qualified immunity is denied because "[t]aking the allegations in the [complaint] to be true ... if the Defendants, without provocation, struck and beat Plaintiff while arresting him ... then Defendants have used excessive force unwarranted by the circumstances [and thus] Defendants have violated the clearly established law of the Fourth Amendment and are not entitled to qualified immunity.").

Defendants argue, however, that dismissal pursuant to the qualified immunity defense is appropriate because it was objectively reasonable for the defendant Police Officers and Lewis to believe that their acts did not violate plaintiff's federal or constitutional rights. Defendants' contentions must be rejected. First, regarding the individual police officers, even if it was objectively reasonable for the officers to believe that force was necessary to effect the arrest given the allegation that Messina was fleeing at the time, plaintiff also alleges that he was beaten while under the custody of the officers and while securely handcuffed. It is difficult to imagine under what circumstances it would be objectively reasonable for an allegedly unprovoking handcuffed prisoner to be slapped and wrapped with a night stick on the back of the knees. Second, it cannot be said, based on the pleadings, that it was objectively reasonable for Lewis to refuse to administer methadone upon Messina's arrival when the Com-

---

**20.** As discussed above, the second and third claims for relief against Watson (First and Fourteenth Amendment violations of the right to the exercise of religion) are dismissed for failure to state a claim upon which relief can be granted. It is therefore not necessary to address defendants' qualified immunity defense vis-a-vis Watson.

plaint alleges that he was suffering from severe withdrawal at the time. Accepting the allegations as true, which the court must on a motion to dismiss, this does not establish objectively reasonable behavior on the part of Lewis. That determination is better left in the context of a motion for summary judgment following discovery. *Cf. Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815 ("Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.").

## VI. *The Pendent State Law Claims*

### A. *The Individual Defendants*

The claims for relief against the defendant Police Officers, Watson, and Lewis included pendent state law claims of emotional pain and suffering, negligence, and negligent infliction of emotional distress. Defendants contend that these causes of action should be dismissed because of plaintiff's alleged failure to properly comply with New York's statutory conditions precedent to suits against municipal employees acting within the scope of their employment.

Section 50–e(1)(a) of New York's General Municipal Law provides in relevant part that,

In any case founded upon tort where a notice of claim is required by law as a condition precedent to commencement of an action or special proceeding against ... any officer, appointee or employee [of a public corporation], the notice of claim shall comply with and be served in accordance with the provisions of this section within ninety days after the claim arises ...

N.Y.Gen.Mun.Law § 50–e(1)(a) (McKinney 1986). Regarding the question of who should be served with the notice, the statute provides that,

No action or special proceeding shall be prosecuted or maintained against ... any officer, agent or employee [of a public corporation] ... unless, (a) a notice of claim shall have been made and served upon the [public corporation] ... in compliance with section fifty-e of this chapter....

N.Y.Gen.Mun.Law § 50–i(1) (McKinney 1986). Regarding the information which must be contained in the notice of claim, the statute provides that,

The notice shall be in writing, sworn to by or on behalf of the claimant and shall set forth: (1) the name and post-office address of each claimant, and of his attorney, if any; (2) the nature of the claim; (3) the time when, the place where and the manner in which the claim arose; and (4) the items of damage or injuries claimed to have been sustained so far as then practicable....

N.Y.Gen.Mun.Law § 50–e(2) (McKinney 1986). The parties agree that because the individual defendants are employees of municipal agencies entitled to indemnification, a notice of claim was mandated in this case. *See, e.g., Ruiz v. Herrera*, 745 F.Supp. 940, 944 (S.D.N.Y.1990) ("the filing of a notice of claim is a prerequisite to filing a civil action in tort against an on-duty police officer."); *Fitzgerald v. Lyons*, 39 A.D.2d 473, 336 N.Y.S.2d 940 (4th Dep't 1972) (service of a notice of a claim is a prerequisite to filing an action against a city employee involved in a car accident).

In this case, it is undisputed that on June 3, 1992, the Law Department of the City of New York Office of Corporation Council received Messina's notice of claim. Winningham Decl., Ex. N. This notice of claim was filed within ninety days after the claim arose, in compliance with Section 50–e(1)(a). It is also clear from the notice itself that it tracked the language of the statute vis-a-vis the information supplied to the City of New York. The notice includes the name and address of claimant and his attorney; the nature of the claim; the time, place, and manner in which the claim arose; and the items of damage or injury. The nature of the claim section lists all of the claims (including the pendent state law claims) asserted against the individual defendants in the Complaint including, among others, negligence, negligent infliction of emotional distress, and violations of 42 U.S.C. § 1983. The notice also recounts in a fair amount of

detail the factual allegations contained in the Complaint, including Messina's arrest and detention and the alleged constitutional violations which occurred (*e.g.*, the use of excessive force and the wrongful denial of medication).

■■■ Irrespective of the fact that the notice of claim contains all the information mandated by the statute, and was timely served on the City of New York, defendants argue that the notice provision of the Civil Practice Law and Rules was not complied with because plaintiff did not file "timely notices of claim with respect to any of the defendants individually named in this action, or against their respective employers. The notice of claim makes no mention of any individual city employees or of any claims against such employees." Defs.' Mem. at 37 (citation omitted). The statute, however, does not require that the claim make mention of any individual employees or claims against such employees. In this situation that would have been impossible because plaintiff only learned the identity of the individuals in response to his interrogatories. Furthermore, the statute states that "[s]ervice of the notice of claim upon an officer, appointee or employee of a public corporation shall *not* be a condition precedent to the commencement of an action against such person." N.Y.Gen. Mun. Law § 50-e(1)(b) (McKinney 1986) (emphasis added). The purpose of the notice of claim provision is to put the municipality on notice as to the nature of the claim against it and its employees thereby giving the municipality the opportunity to investigate the merits of the claim before the initiation of litigation. *Annis v. New York City Transit Auth.*, 108 A.D.2d 643, 644, 485 N.Y.S.2d 529, 530–31 (1st Dep't 1985) ("The purpose underlying the notice of claim provision in General Municipal Law, section 50-e, is to protect the municipality against unfounded claims and to assure it 'an adequate opportunity ... to explore the merits of the claim while information is readily available.'") (quoting *Teresta v. City of New York*, 304 N.Y. 440, 443, 108 N.E.2d 397, 398 (1952)). In this case, the City was put on notice vis-a-vis the nature of the claims against its employees (officers or agents of its police and correction departments) and hence the notice of claim was not invalid.

■■■ In their Reply Memorandum of Law, however, defendants retreat from their position that individual defendants must be included in the notice of claim and state instead that "§ 50-e unambiguously requires that the City be notified that plaintiff intends to sue individuals who are entitled to indemnification from the City." Defs.' Reply Mem. at 29. If by this defendants mean that Section 50-e requires a valid notice of claim prior to litigation, they are correct and plaintiff has complied. If by this defendants mean that the statute requires an affirmative statement that claimant intends to sue public corporation employees as opposed to the public corporation itself, a cursory glance at the statute makes clear that it contains no such requirement. Defendants rely on two lower court New York cases, but neither authority stands for the proposition submitted by defendants. *Sorge v. City of New York*, 56 Misc.2d 414, 288 N.Y.S.2d 787 (N.Y.Sup.Ct.1968) (action for slander and libel against city and two of its police officers dismissed because defendants' statements occurred in judicial proceedings and hence were absolutely privileged; notice of claim must be filed with the city); *Campos v. New York City Transit Auth.*, 93 Misc.2d 708, 403 N.Y.S.2d 832 (N.Y.Civ.Ct.1978) (in action against transit authority and its patrolman for false arrest, assault and battery, plaintiff was required to serve notice of claim upon the transit authority). Although it is undisputed that Messina did not serve his notice of claim on the Department of Correction and the Police Department as well as the City of New York, service on the public corporation is all that the statute mandates. N.Y.Gen. Mun.Law § 50-i(1) (McKinney 1986). *See also Ruiz v. Herrera*, 745 F.Supp. 940, 945 (S.D.N.Y.1990) (where arrestee brings action against police officer for common law negligence, court concludes that "plaintiff here was required to serve a notice of claim on the village of Port Chester as a condition precedent to filing this civil action against the police officers....").

## B. *The City of New York*

█ The seventh claim for relief is a pendent state law claim against the City of New York based on the doctrine of respondeat superior stemming from the acts of the defendant Police Officers, Watson, and Lewis. Defendants seek an order dismissing this cause of action for failure to commence suit within the applicable statute of limitations.

Section 50–i(1) of the General Municipal Law provides that any action against a city "shall be commenced within one year and ninety days after the happening of the event upon which the claim is based[.]" N.Y.Gen. Mun.Law § 50–i(1) (McKinney 1986). In this case, the actions which form the basis of this claim for relief occurred between April 2, 1992 and April 7, 1992. Although a notice of claim was timely filed, *see supra*, plaintiff did not add the City of New York as a defendant and did not assert this claim against it until the filing and serving of his Amended Complaint on October 7, 1993, some three months past the point when the statute of limitations had expired. It becomes necessary, therefore, to determine whether the Amended Complaint relates back to the first complaint (which was filed within one year and ninety days from the events at issue) for statute of limitations purposes where, as here, plaintiff has added a new party.

Federal Rule of Civil Procedure 15(c)(3) provides that an amendment of pleading relates back to the date of the original pleading when,

> the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied[21] and, ... the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c)(3). In this situation, the provisions of 15(c)(2) have clearly been met;

the claims asserted against the City of New York arose out of the conduct, transaction or occurrence set forth in the original pleading (*i.e.*, the alleged use of excessive force, the treatment by Correction Officer Watson, and the alleged wrongful denial of medication). It is also the case that the City of New York received adequate notice of the institution of the action; its attorney, the Corporation Counsel for the City of New York, was representing defendant Mazzeo when the first complaint was served. *Fleming v. Department of Justice*, No. CV–90–0896, 1993 WL 16117 at *3 (E.D.N.Y. Jan. 20, 1993) ("The new parties have also received adequate notice of the institution of this action since Corporation Counsel for the City of New York is a common government attorney who represents both the previous defendant and the newly named defendants....."). However, the final prong of Rule 15(c)(3) has not been satisfied in this case: while preparing its defense of Mazzeo, the Corporation Counsel had no reason to know that, but for a mistake of identity, the new defendant—the City of New York—would have been sued for respondeat superior liability. *Gleason v. McBride*, 869 F.2d 688, 694 (2d Cir.1989). This is not a case where the original pleading mistakenly named a wrong defendant. *Fleming*, 1994 WL 16117 at *3 ("The omission of the individually named police officers in the original complaint reflects more likely a mistake than a tactical judgment about the propriety of suing the individual police officers."). Rather, the original pleading alleged constitutional and common law violations against police officers, a correction officer, and a prison doctor. It is too much to say that the City of New York, through its attorney, knew or should have known that Messina, but for a mistake, would have alleged a claim for relief against the City of New York based on the doctrine of respondeat superior. Although clearly the City of New York is not prejudiced by the inclusion of this claim for relief, that is but one aspect of Rule 15(c). Where the amendment of the pleading seeks to name a new defendant, the amendment

---

21. This provision requires that "the claim ... arose out of the conduct ... set forth ... in the original pleading[.]" Fed.R.Civ.P. 15(c)(2).

does not relate back to the original pleading unless the party to be added "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against [him]." Because that is not the case here, plaintiff's seventh claim for relief is dismissed as untimely. *See generally Schiavone v. Fortune*, 477 U.S. 21, 29, 106 S.Ct. 2379, 2384, 91 L.Ed.2d 18 (1986) (outlining four elements which must be met in order for amended pleadings to relate back when a new party is sought to be added; "that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it.").

 Plaintiff argues, however, that the original complaint did, in fact, include the City of New York as a defendant because Mazzeo, Watson, and "Doctor John Doe # 5" were sued in both their individual and official capacities and, as a general rule, "official capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Brandon v. Holt*, 469 U.S. 464, 472 n. 21, 105 S.Ct. 873, 878 n. 21, 83 L.Ed.2d 878 (1985). It is certainly the case that when public officers are sued in their official capacity the real party in interest is the municipal or state employer. "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). However, the purpose of this legal construct is not to avoid a statute of limitations on one cause of action against a government entity by asserting a claim against a person in his official capacity on an entirely different cause of action, albeit arising from the same facts. Rather, the distinction between individual and official capacity suits is to allow the real party in interest to assert the immunities and defenses to which they are entitled (*e.g.*, Eleventh

Amendment immunity from suit or the need to assert municipal custom or policy). *See generally Hafer v. Melo*, —— U.S. ——, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (finding that a state official may be sued personally for damages under Section 1983 and outlining the distinctions between individual and official-capacity suits). Furthermore, plaintiff has not brought to the court's attention, and research did not discover, any authority for the proposition that a suit against a person in his official capacity is a suit against the state or municipality for statute of limitations purposes.[22] It is not the case, therefore, that by suing Mazzeo, et al. in their official capacities, Messina also sued the City of New York for statute of limitations purposes vis-a-vis the common law tort of respondeat superior. Plaintiff's reliance on Rule 15(c)(2) and *Glover v. City of New York*, 446 F.Supp. 110 (E.D.N.Y.1978) (where original pleading named city as defendant and amended complaint alleges a new claim against the city, the amendment relates back for statute of limitations purposes because it arose from the same conduct set forth in the original pleading), is therefore misplaced.[23]

### CONCLUSION

For the foregoing reasons, the court concludes as follows:

1. The motion to dismiss the 42 U.S.C. § 1983 claims for relief against the defendant Police Officers for failure to allege personal involvement is denied;

2. The motion to dismiss the first claim for relief against the defendant Police Officers is denied;

3. The motion for summary judgment on the first claim for relief is denied;

4. The motion to dismiss the second claim for relief against Correction Officer Watson is granted with prejudice;

---

**22.** This is not surprising. If an official-capacity suit were in fact an action against the public corporation for statute of limitations purposes, there would be no need to require that a notice of claim be served on the public corporation prior to the initiation of suit.

**23.** Plaintiff makes no argument that relation back is appropriate pursuant to Rule 15(c)(3), but relies instead on the proposition that the City of New York was a party defendant named in the first complaint.

148

5. The motion to dismiss the third claim for relief against Correction Officer Watson is granted with prejudice;

6. The motion to dismiss the fourth claim for relief against Lewis is denied;

7. The motion for summary judgment on the fourth claim for relief against Lewis is denied;

8. The motion to dismiss the 42 U.S.C. § 1983 claims for relief against the defendant Police Officers and Lewis based on qualified immunity is denied;

9. The motion to dismiss the 42 U.S.C. § 1983 claims for relief against Correction Officer Watson based on qualified immunity is moot;

10. The motion to dismiss the pendent state law claims against the defendant Police Officers, Correction Officer Watson, and Lewis is denied; and,

11. The motion to dismiss the seventh claim for relief against the City of New York is granted.

SO ORDERED.